CIV-MIDDLEBROOKS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DENNIS BIRD, on behalf of himself and all others similarly situated, | No. 98 - 8258 |
| Plaintiff, | MAGISTRATE JUDGE GARBER |
| | **COMPLAINT - CLASS ACTION** |
| -against- | |
| SUNBEAM CORPORATION, ALBERT J. DUNLAP, RUSSELL A. KERSH and DONALD R. UZZI, | **TRIAL BY JURY DEMANDED** |
| Defendants. | |

Plaintiff, by his attorneys, as and for his Class Action Complaint, alleges

the following upon personal knowledge as to himself and his acts and as to all other

matters upon information and belief based upon, inter alia, the investigation made by and

through his attorneys, including a review of the public filings of Sunbeam Corp.

("Sunbeam" or the "Company") with the Securities and Exchange Commission ("SEC"),

published reports and news articles.

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action

pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15



U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

      2.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this Judicial District. In addition, Sunbeam maintains its principal executive office within this Judicial District.

      3.      In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mail, telephone communications and the facilities of national securities exchanges.

## NATURE OF THE ACTION

      4.      This is a securities class action brought by plaintiff on behalf of himself and all persons as described below (the "Class"), other than defendants and related parties, who purchased or otherwise acquired shares of Sunbeam between October 22, 1997 and April 3, 1998 (the "Class Period").

      5.      Defendants' public misrepresentations and omissions of material adverse information regarding, _inter alia_, the Company's financial condition were known to them, or were recklessly disregarded by them and caused the market price of Sunbeam securities to be artificially inflated during the Class Period.

6.     Each of the defendants either knew or recklessly disregarded the fact that the statements and omissions described in this complaint were false and misleading, that such statements would adversely affect the integrity of the market for Sunbeam securities, and that such statements would deceive investors into purchasing Sunbeam securities at artificially inflated prices.

## THE PARTIES

7.     During the Class Period, plaintiff and each member of the Class purchased shares of Sunbeam common stock in the open market without knowledge of the false and misleading statements and omissions of the defendants and without knowledge that the stock price was inflated during the Class Period, and have suffered damages as a result.  During the Class Period, plaintiff and each member of the Class directly or indirectly relied upon the defendants' public reports, press releases, filings with the SEC and other public statements, as more fully described below, and the fact that Sunbeam stock was fairly priced and/or upon the integrity of the market for Sunbeam securities.  As a result, plaintiff and each member of the Class has been damaged by the defendants' wrongful conduct.

8.     On March 20, 1998, plaintiff Dennis Bird purchased 600 shares of Sunbeam common stock at $45.50 per share and was damaged thereby as set forth herein.

9.     Defendant Sunbeam is a corporation duly organized and existing under the laws of the state of Delaware with its principal executive offices located at 1615 South Congress Avenue, Delray Beach, Florida.  It develops, manufactures and markets

3

consumer products such as gas, barbecue grills, outdoor casual furniture, warming blankets, vaporizers and outer kitchen and household appliances. As of December 28, 1997, Sunbeam had over 86.4 million shares of common stock outstanding. Its common stock is actively traded on the New York Stock Exchange ("NYSE") under the symbol "SOC."

10.   Defendant Albert Dunlap ("Dunlap") is and was, at all times relevant hereto, Sunbeam's Chairman of the Board and Chief Executive Officer since July 18, 1996.

11.   Defendant Russell A. Kersh ("Kersh") is and was, at all times relevant hereto, Sunbeam's Executive Vice President, Finance and Administration since July 22, 1996 and a director since August 6, 1996.

12.   Defendant Donald R. Uzzi ("Uzzi") was, at all times relevant hereto, Sunbeam's Executive Vice President, Consumer Products, worldwide since January 1997 and served as Sunbeam's Senior Vice President, Global Marketing from November 1996 to January 1997.

13.   Defendants Dunlap, Kersh and Uzzi are collectively referred to herein as the "Individual Defendants."

14.   As officers, directors and/or controlling persons of a publicly-held company whose common stock is registered with the SEC under the Exchange Act, traded on the NYSE, and governed by the provisions of the Exchange Act, defendants had a duty to promptly disseminate accurate and truthful information with respect to the

4

Company's operations, business, products, markets, management, earnings, present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Sunbeam, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

15.    During the Class Period, each of the Individual Defendants was a senior executive and/or director of Sunbeam and was thereby privy to confidential and proprietary information concerning Sunbeam, its operations, finances, financial condition, present and future business prospects. Defendants also had access to, and were aware of, material adverse non-public information concerning Sunbeam, as discussed in detail below. Because of their Board memberships and/or top executive and managerial positions with Sunbeam, each of the Individual Defendants had access to adverse non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, each of these defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public.

5

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to the Company.   Each of the Individual Defendants was provided with copies of Sunbeam's management reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  As a result, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein as "group published" information and is therefore responsible and liable for the representations contained therein.

17.     Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their stock ownership and their status as officers and/or directors of Sunbeam, were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, these defendants were able to and did, directly or indirectly, control the conduct of Sunbeam's business, the information contained in its filings with the SEC and public statements about its business.

18.     During the Class Period, defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to

6

misrepresent the results of Sunbeam's operations and to conceal adverse material information regarding the finances, financial condition, and results of operations of Sunbeam as specified herein. Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct as herein alleged in an effort to increase and maintain an artificially high market price for the common stock of Sunbeam and to increase their own remuneration as a result. This included the formulation, making, and/or participation in the making of untrue statements of material facts, and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon plaintiff and the other members of the Class.

## CLASS ACTION ALLEGATIONS

19.   Plaintiff brings this case as a class action pursuant to Rules 23 (a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who purchased or otherwise acquired Sunbeam common stock between October 22, 1997 and April 3, 1998, inclusive. Excluded from the Class are Sunbeam, its subsidiaries and affiliates, the Individual Defendants, members of the immediate families of each of the Individual Defendants, and any entities in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the defendants.

20.   This action is properly maintainable as a class action because:

(a)   During the Class Period, in excess of 86.4 million shares of

7

Sunbeam common stock were outstanding. The common stock was actively traded on an impersonal and efficient trading market during the Class Period. The members of the Class for whose benefit this action is brought are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. Millions of Sunbeam shares were publicly traded during the Class Period and, upon information and belief, plaintiff believes that there are thousands of members of the Class;

(b)     Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff and all members of the Class sustained damages as a result of defendants' wrongful conduct complained of herein;

(c)     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class he seeks to represent;

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

(e)     Plaintiff anticipates no unusual difficulties in the management

8

of this action as a class action; and

      (f)     The questions of law and fact common to the members of the Class predominate over any questions affecting any individual members of the Class.

      21.    The questions of law and fact which are common to plaintiff and the Class include, among others:

      (a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)    Whether the documents, releases, reports and/or statements disseminated to the investing public and to Sunbeam common stock holders during the Class Period omitted or misrepresented material facts about the financial condition, business and income of Sunbeam;

      (c)    Whether defendants have acted with knowledge or with reckless disregard for the truth in omitting to state and/or misrepresenting material facts;

      (d)    Whether, during the Class Period, the market price of Sunbeam common stock was artificially inflated due to the non-disclosures and/or material misrepresentations complained of herein;

      (e)    Whether the defendants participated in and pursued the common course of conduct complained of herein; and

      (f)     Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

      22.    Plaintiff will rely, in part, upon the presumption of reliance

established by the fraud-on-market doctrine. The market for Sunbeam common stock was at all times an efficient market for the following reasons, among others:

        (a)    Sunbeam met the requirements for listing, and is listed on the NYSE;

        (b)    As a regulated issuer, Sunbeam filed periodic public reports with the SEC and the NYSE;

        (c)    Sunbeam's securities volume was substantial during the Class Period;

        (d)    Sunbeam was followed by various analysts employed by major brokerage firms, including CIBC Oppenheimer ("Oppenheimer"), Prudential Securities ("Prudential"), Bear, Stearns & Co. ("Bear Stearns") and PaineWebber Inc. ("PaineWebber") who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms and which were available to various automated data retrieval services;

        (e)    The market price of Sunbeam securities reacted efficiently to new information entering the market.

        23.    The foregoing facts clearly indicate the existence of an efficient market for trading of Sunbeam securities and make applicable the fraud-on-the-market theory. Similarly, plaintiff and the other members of the Class are entitled to a presumption of reliance with respect to the misstatements and omissions alleged in this Complaint.

## SUBSTANTIVE ALLEGATIONS

24.     The Class Period begins with the October 22, 1997 announcement by Sunbeam of its earnings for the quarter ended September 30, 1997. On October 22, 1998 Sunbeam announced net income for its third quarter ended September 30, 1997 (the "Third Quarter") of $34.5 million, or $.39 per share, a huge turnaround from the year-earlier loss of $15.8 million, or $.19 per share. The results exceeded the average from 8 analysts surveyed by IBES International, Inc. The Company also reported a 25% increase in revenue to $289 million from $231.8 million. Defendant Dunlap has a reputation as a turnaround specialist. He came to Sunbeam in July 1996 and publicly pledged to turn Sunbeam around within a year. On October 22, 1997, he said that "This is the first time in the Company's history that it has consistently achieved double-digit sales growth, each quarter, without an acquisition." In his remarks, Dunlap said "The fourth quarter is going to be tremendous." He stated that sales in outdoor cooking products would be up about 15% in 1997 with the expectation going forward of 20% growth in outdoor cooking. He said that the margins were "excellent for the retailer" and for Sunbeam and that the Company had refocused its retail sales to sell that line. However, in announcing Sunbeam's Third Quarter results and making the above statements defendants failed to disclose the material facts that: a) it was only as a result of Sunbeam's success in stuffing the channels for its outdoor cooking products (a practice used to encourage customers to buy more product then they need at a discount in order to boost Sunbeam's sales and net income figures) that caused this "double-digit sales

11

growth" in the Third Quarter) and that b) without swiftly making some large acquisitions, channel stuffing alone would be insufficient to mask declining sales and earnings at Sunbeam.

25.     In connection with the announcement of the Third Quarter results, Dunlap expressed pleasure that the "rate of revenue growth has continued to accelerate, concurrent with a dramatic expansion of operating margins" to "19% during the third quarter". He attributed the Third Quarter sales results to strong increases in all of the Company's five global business categories.

26.     On October 23, 1997, Sunbeam announced its retention of Morgan Stanley & Co. Incorporated ("Morgan Stanley") to served as its financial advisor in exploring strategic alternatives for the Company. Dunlap said that the Third Quarter earnings reflected solid achievement in the past 15 months "since our new management team began the task of turning the Company around" and that it was now exploring various courses of action including, acquisitions, mergers or a sale of the Company."

27.     On October 23, 1997, a Bear Stearns analyst reiterated a "buy" recommendation for Sunbeam. On October 28, 1997, Andrew Shor, a PaineWebber analyst, raised Sunbeam to "buy" from "attractive".

28.     On October 24, 1997, Sunbeam filed its Form 10-Q for the quarter ended September 28, 1997 with the SEC ("September 10-Q"). It was signed by defendant Kersh. The September 10-Q included the sales and earnings information set forth in paragraph 24 above. It reported that global sales increased during the quarter

12

and nine months in all five of the Company's product categories (Appliances, Healthcare, Personal Care and Comfort, Outdoor Cooking and Away from Home) with global sales exceeding 30% in the Third Quarter in the appliance and personal care and comfort categories and over 26% in the outdoor cooking category. The Company cited its successful efforts to improve margins. The gross margin percentage for the Third Quarter increased 18.3 percentage points to 30.7 % and an increase of 10.5 percentage points to 27.8% for the nine month period.

29.   Following the release of Sunbeam's Third Quarter 1997 financial results and based on information provided by the Company, several analysts issued favorable reports which included increases in earnings per share estimates and price targets. For example:

(a)   In its October 22, 1997 report, CIBC Oppenheimer observed that Sunbeam had a 25% year-over-year sales increase and 30.7% gross margin which were better than its expectations, and a 23% increase in receivables from the second-quarter. It raised its 1997 earnings per share estimate by $.05 to $1.45 per share and $.07 in 1998 to $2.22. It also raised its one-year target price to $58-$60 per share.

(b)   In its October 24, 1997 report, Merrill Lynch Capital Markets noted that while "inventory and receivables were both up significantly at quarter end, management attributes these increases to timing and the seasonal build for the fourth quarter." Merrill commented favorably on strong Third Quarter results (which beat its estimate) and observed that "sales of outdoor products (11% of total) increased 26% as

Sunbeam was successful in extending the selling season in grills." In commentary on the increase in inventories (40%) and receivables (23%), Merrill said "management attributes the receivable increase mostly to timing differences as a significant portion of the quarter's sales were shipped in September. The inventory build reflects management's anticipation of strong fourth quarter sales. Management is confident both of these levels will drop significantly in the fourth quarter . . . . Given the strong sales momentum, we are given to believe management's conviction." Based on the information Merrill obtained from Sunbeam, it estimated fourth quarter earnings per share of $.48 and earnings potential on the high end of its $1.30-$1.50 1997 range. It estimated earnings of $1.70-$1.90 per share for 1998.

(c)     Prudential reiterated its "buy" rating with a 12-month price target of $55 per share based on "current 1999 earnings per share estimates of $2.50. Its 1997 and 1998 estimates are $1.40 and $2.10 per share, respectively. It discussed solid Third Quarter sales growth and that it: "remains well positioned to continue to accelerate sales growth in 4Q97 driven by innovative new products, increased penetration of existing customers . . . and new domestic distribution." Prudential said this fourth quarter earnings estimate might prove too conservative, particularly because it is a traditionally stronger quarter, with October and November being the strongest month.

(d)     Thereafter, securities analysts continued to recommend Sunbeam to their customers as a company to purchase. For example,

(i)     On November 21, 1997, Sunbeam was reiterated a

14

"buy" at Bear, Stearns & Co.

(ii)    On December 10, 1997, Sunbeam was reiterated "strong buy" by CIBC Oppenheimer and a "buy" at Prudential.

(iii)    On December 17, 1998, Prudential reiterated that its recommendation for Sunbeam with a $55 per share 12-month target price.

(iv)    On January 14, 1998, Prudential Securities reinstated Sunbeam as a "buy".

30.    Defendant Dunlap, known as "Chainsaw Al", came to Sunbeam to turn it around.  In an effort to maintain his record, he slashed 6,000 jobs and cut out 87 percent of the Company's product lines.  He explained in a November 7, 1997 interview on CNN that his restructurings are, in actuality, "rescue missions".

31.    On December 12, 1997, defendant Uzzi was interviewed on Bloomberg News about the reasons behind Sunbeam's 1997 sales increases, its products and the sales strength of its blender and outdoor/cooking product lines.  He stated that the momentum in the first 3 quarters of 1997 was "sustainable" and talked at length about Sunbeam's outdoor cooking products.  He explained that the 1997-1998 grill line had been redesigned and was being shipped and that the grill line had been broadened.

32.    On December 29, 1997, Sunbeam announced, on Bloomberg Forum, that it "expects record profit this year, rebounding from last year's loss, by selling a trimmed-down line of improved products" according to defendant Uzzi.  Sunbeam reported that new designs in various products, including blenders, grills and mixers, "will

15

boost sales in 1998 and keep Sunbeam on track to generate sales of $2 billion by the end of 1998." Uzzi said, "all our businesses' sales are up in the double digits this year, which is a result of us going back and determining the appropriate positioning for the products."

33.     Continuing its positive announcements, on January 28, 1998, Sunbeam announced record sales and earnings for its fourth quarter and full year 1997. Fourth quarter sales were reported to be $338 million, a 30.6% increase over 1997. Revenue of $1.168 billion was 22.4% above 1996 on a comparable basis and earnings per share from continuing operations of $1.41 were $1.51 above the 1996 $.10 per share loss. 1997 earnings per share rose $3.78 from the $2.37 loss in 1996. The Company discussed the progress made in its three year strategy to achieve $1 billion in revenue growth which it embarked on in 1997. Dunlap said he was "proud of the dramatic turnaround we have achieved at Sunbeam in such a short period of time as we continue to execute against our three-year growth plans. Our continuous sales increases of 13%, 17%, 28% and 31% in the four quarters of 1997, for an overall sales increase of 22% for the year, are a clear indication that our strategy is working." Dunlap also said Sunbeam had set a 3 year goal to have 20% operating margins and "we were essentially at that level in the third and fourth quarters this year." The Company also announced its goals for 1998 which "anticipate increases in sales and margins at rates above those experienced in 1997."

34.     While Sunbeam touted its results, its $.47 fourth quarter earnings

failed to meet analysts estimates of \$.50 per share.  Sunbeam said it was unable to produce enough of its hottest selling electric blankets, while sales of others fell short of forecasts due to unreasonably warm weather.  Dunlap said its blanket factory has been revamped to ensure there will not be another shortage.  Dunlap, during his January 28, 1998 interview on Cavuto business report, said that the fourth quarter earnings were a "temporary aberration", that "we haven't missed anything," and that Sunbeam was "not uncomfortable with street estimates next year of \$2".

35.    In a series of news releases on March 2, 1998 and March 3, 1998, Sunbeam announced an "aggressive expansion strategy with the announcement of the acquisitions of three separate market leading durable product companies which will "enhance shareholder value by nearly tripling the Company's annual revenues . . ."  The 3 transactions would total approximately \$2.5 billion (including \$700 million of assumed debt) and would be "meaningfully accretive" to Sunbeam earnings within 12 months.  The Companies being acquired were the Coleman Company, Inc. (the global leader in outdoor recreation and hardware products with 1997 revenues of \$1.1 billion), Signature Brands USA, Inc. (the North American leader in coffee makers with revenues of \$229 million), and First Alert, Inc. (the worldwide leader in residential safety equipment with 1997 revenues of \$187 million).  While Dunlap touted these acquisitions as the next phase of our plan to create value for Sunbeam's shareholders", Sunbeam failed to disclose that having pushed as much inventory as possible into customers' hands in the Third Quarter, and knowing that it was unable to sustain its momentum in the fourth quarter and beyond,

17

particularly due to a drop-off in sales of its outdoor cooking products that had already begun to occur in the Third Quarter, Sunbeam worked to hurriedly announce these three acquisitions to boost its stock price (which dropped with the fourth quarter 1997 earnings announcement (which fell $3 9/16 per share to $38 in trading of 3.8 million shares, more than three times its three-month daily average) and mask a further decline in Sunbeam's revenues and earnings. As Bloomberg News reported, "Al Dunlap isn't as predictable as we thought" since the market expected a sale of Sunbeam and the acquisition announcement caught investors "unawares". Sunbeam's share price rose $3.875 per share to $45.625 per share on the announcement. The Company also announced the extension of its employment contracts for its three top executives, including Dunlap and Kersh.

36.     Analysts responded to the Company's March 2 and March 3 announcements by increasing their earnings estimates. For example, Oppenheimer, in its March 5, 1998 analyst report, said it expected its 1999 estimate to increase to $2.85 - $3.00 after participating in Sunbeam's March 2, 1998 conference call. During the call Sunbeam management stated its view that it could carve out $150 million in costs at the 3 companies being acquired, along with other benefits.

37.     On March 6, 1998, Sunbeam filed its Form 10-K for the year ended December 28, 1997 with the SEC, signed by defendants Dunlap and Kersh. It included the Company's previously announced earnings and revenues and stated that sales of outdoor cooking products accounted for approximately 34% of the Company's 1997 net sales.

38.     On March 9, 1998, Sunbeam announced it had launched cash tender

offers for First Alert and Signatory Brands on March 6, 1998, each of which was to

expire on April 2, 1998.  The industry viewed these acquisitions favorably and positive

comments from Ronald Perelman and Michael Price (Chief Executive Officer of Franklin

Mutual Series Fund) were included in Company press releases.  This information served

to keep Sunbeam's trading price up.

39.     Sunbeam's Preliminary Proxy for the 1998 Annual Meeting of

Shareholders, filed with the SEC on March 13, 1998, stated that Dunlap beneficially

owned 5,241,564 shares of Sunbeam common stock, or 6.06% of the Company's

common stock outstanding, that Russell Kersh beneficially owned 1,045,500 shares of

Sunbeam's common stock, or 1.21% of the Company's common stock outstanding, and

that defendant Uzzi owns 116,666 shares of Sunbeam's common stock, all or most of

which shares were acquired at prices well below Sunbeam's trading price during the Class

Period.  Their compensation for 1996 and 1997 (which shows the dramatic increase

received by defendants Dunlap, Kersh and Uzzi included the following:

Annual Compensation                      Long Term Compensation
                                                     Awards

| Name | Year | Salary ($) | Bonus ($) | Other Annual Compensation | Restricted Stock ($)(1) | Securities Underlying Options/SARs Awards | All Other Compensation ($)(2) |
|------|------|-----------|-----------|--------------------------|-------------------------|-------------------------------------------|-------------------------------|
| Albert J. Dunlap | 1997 1996 | 1,115,385 507,054 | 0 0 | 282,888 63,850 | 0 12,500,000 | 0 2,500,000 | 4,750 4,750 |
| Russell Kersh | 1997 1996 | 425,000 190,384 | 0 125,000 | 29,283 240,598 | 0 1,812,500 | 0 500,000 | 4,750 2,098 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Donald Uzzi | 1997<br>1996 | 400,000<br>94,904 | 0<br>0 | 54,787<br>100,456 | 0<br>0 | 100,000<br>250,000 | 4,750<br>4,750 |

40.   The 1998 Preliminary Proxy also set forth information regarding options to purchase common stock granted to Uzzi in 1997 pursuant to the Company's option plan.  He was the only executive to receive such grant in 1997.  He received 100,000 options with a term of 10 years which become exercisable over three years in equal annual increments.  They are exercisable at $25.54 per share, well below the then and current stock trading prices.  Their potential realizable value, calculated at the 5% and 10% growth rates set by the SEC, are $1,606,197 and $4,070,418, respectively.

41.   The 1998 Preliminary Proxy further stated:

The following table sets forth information with respect to option exercises occurring during 1997 and the number of options held by the Named Executives at the Company's fiscal year end.

| No. of Securities Underlying Unexercised Options Held at December 28, 1997 | | | Value of Unexercised In-the Money Options at December 28, 1997 (1) | | | | |
|---|---|---|---|---|---|---|---|

| Name | Shares Acquired on Exercise | Value Realized | Unexercisable | Exercisable | Unexercisable ($) | Exercisable ($) |
|---|---|---|---|---|---|---|
| Albert J. Dunlap | 0 | 0 | 1,666,666 | 833,334 | 50,520.813 | 26,260,436 |
| Russell Kersh | 0 | 0 | 1,666.666 | 333,334 | 4,717,064 | 9,434,184 |
| Donald Uzzi | 0 | 0 | 83,333 | 266,667 | 1,615,202 | 4,932,672 |

42.   The 1998 Preliminary Proxy also discussed the three year

employment agreement the Company entered into with Dunlap on February 1, 1998 (with successive one-year renewal periods). Pursuant thereto, Dunlap will receive a $2 million annual base salary which may be increased but not decreased. All of his outstanding options granted under his prior employment agreement vested as of February 20, 1998. As of February 1, 1998, he received a grant of 300,000 shares of common stock at $36.85 (well below the Company's trading price and for a 10 year period). Given the market value of his package of over $52 million, the Company's March 19 news (see paragraph 45 below), accompanied by a stock drop, still left him with an over $35 million paper profit.

43. The Company also entered into agreements with defendants Kersh and Uzzi on February 1, 1998 who will receive base salaries of $875,000 and $595,000, respectively. Kersh received a restricted stock grant of 150,000 shares which will vest in 4 installments on February 28, 1998 and the three following anniversaries. Kersh also received a grant of an option to purchase 1,125,000 shares of common stock at $36.85 per share.

44. Defendants here were motivated to maintain Sunbeam's stock price at levels as high as possible given the nature of their compensation packages. As set forth above, a significant portion of defendants' compensation has been remuneration in the form of stock options. As stated in Sunbeam's April 17, 1997 Proxy Statement for its Annual Meeting of Shareholders, the Company's most senior officers' "sole incentive beyond base salary is based upon substantial grants of stock options, ownership of stock

21

and increases in shareholder value.   These persons are heavily dependent upon an increase in the price of the Company's shares to realize the potential of their compensation packages."

45.   Just six days later, on March 19, 1998, Sunbeam issued a press release in an effort to execute a "soft landing".   Sunbeam said it is "possible" that its net sales for the first quarter of 1998 "may be lower" than the range of Wall Street  analysts' estimates of $285 to $295 million, but they were expected to be higher than the year ago $253.4 million.   To keep the stock price as high as possible, the Company "stressed that sales of its product at retail remains very strong", that it remains "highly confident about the overall sales outlook" for its products this year and that the "shortfall from analysts' estimates, if any, would be due to changes in inventory management and order patterns at certain of the Company's major retail customers."   Based on information from defendants, analyst Justin Maurer at McDonald & Co., who rated the stock an "aggressive buy", said any shortfall may be slight and that the Company raised the possibility because of disclosure issues from a planned offering of convertible bonds as it was financing 3 acquisitions.   He explained "They are erring on the side of conservation. They would not have made this statement otherwise".   Money manager Kinnison agreed and expected the shortfall to be small.   The Company's stock price decreased $4 11/16 on the news to $45 3/8 per share on trading of 5.5 million shares.

46.   Unbeknownst to the investing public and undisclosed by defendants, was their effort to slowly let out the news of its second underperforming quarter in a row,

in order to buoy investor confidence and Sunbeam's stock price in the face of an upcoming convertible bond offering and the over $800 million in Company stock being used to finance the Coleman acquisition. The perception of financial well-being was also important to successful completion of its 2 other announced acquisitions.

47. On April 3, 1998, Sunbeam shocked the market when it announced that it would post a first-quarter 1998 loss on lower sales. The Company said its first quarter sales fell about 5% from $253 million a year ago. According to the Company, weak grill sales and acquisition-related changes sapped profitability. The Company said it would post one-time charges related to the recent acquisitions in the first quarter, equivalent to $.40 per share. Based on the number of shares outstanding, the charges would equal about $35 million. The news surprised analysts surveyed by First Call who expected Sunbeam to earn about $.30 per share in the first quarter, particularly after Sunbeam's March 19, 1998 statement that it would fall short of Wall Street's $285 million to $295 million sales expectation, but exceed the year-ago level of $253.5 million and after the tremendous financial benefits the Company said it would enjoy as a result of the acquisitions, as set forth above.

> Our first quarter started slowly this year after an excellent
> Holiday Season; however, we fully expected our grill sales,
> especially reorder business late in the quarter, to meet a level
> which was not realized. Grill reorder business can be
> difficult to forecast, as the demand may come late in the first
> quarter or in the second quarter. In addition, we believe
> retailers are continuing to manage down their inventories,
> although retail sales reports are encouraging.

23

                              *     *     *

>           While there are reasons for our sales shortfall in the quarter,
>           we clearly are not satisfied with this performance and have
>           taken decisive action to deal with the situation.

This decisive action included firing Uzzi who was head of Consumer Products and

Richard Gindis Vice President, Finance.   To the contrary, the Company's statements

accompanying the announcements of its third and fourth quarter  financial results and in

its Third Quarter 1997 Form 10-Q and 1997 Form 10-K, discussed above, indicated the

Company's comfort with continued sales and earnings at the stated levels.   No indication

was previously given that the Company had any consumer products concerns.    In

addition, the Company had announced the generous compensation package granted Uzzi

just a month before.   Apparently, however, the Company had other plans in mind.   As

Dunlap said,

>           In addition, we have accelerated a search process which we
>           had initiated when we first determined to pursue a strategy of
>           growth through acquisitions and consolidation of our industry.
>           We are recruiting a very senior executive with broad based
>           experience in running all aspects of the business, with full
>           profit and loss responsibility, to serve as President of our
>           Outdoor Leisure business, which will include both the
>           Coleman core business and Sunbeam's outdoor cooking
>           business.  We are building a strong organization below these
>           two senior positions and already have identified good
>           executives at the companies we are acquiring who will
>           contribute to the future success of the combined companies.
>           Our search is reaching its final stages, and we look forward
>           to announcing the results in the near future.

       48.    Dunlap arrived at Sunbeam in July 1996 and publicly pledged to turn

                                     24

the Company around within a year. He pushed Sunbeam hard in order to maintain his reputation as a turnaround expert, and gave many interviews to tout these turnaround efforts. However, when these efforts failed to meet the desired level of access, management took actions designed to mask their lack of progress and to maintain Sunbeam's stock price at artificially high levels.

49. In order to continue reporting double digit sales and net income figures they had pledged and securities analysts expected, it would be necessary to induce customers to materially increase their purchases of the Company's outdoor grills (which comprised over 34% of Sunbeam's sales) to materially increase their purchases in the third quarter of 1997, notwithstanding the adverse impact this could have on future quarters. To that end, defendants caused Sunbeam to offer inducements to Sunbeam customers to cause them to purchase materially larger than needed quantities of the Company's grills in the Third Quarter. While some analysts remarked on the large proportion of grill sales in September 1997 (the last month of the quarter) they were assured by information provided by the Company that this was not of concern.

50. The impact of these sales inducements was felt in the 1997 fourth quarter, but its real impact was not evident until the first quarter of 1998. Ultimately, the Company had to admit on April 3, 1998 that the first quarter "started slowly" and that retailers are "continuing to manage down their inventories." Knowing that the inevitable "bad news" was coming, defendants negotiated the enormous compensation agreements discussed above and announced Dunlap's commitment to remain at Sunbeam for at least

5 years. Defendants then attempted to avert a huge price drop by rushing to announce the acquisition of 3 companies for a total of $2.5 billion.

51.    Sunbeam then tried to execute a soft landing by announcing that first quarter earnings would not be what analysts had come to expect.    The Individual Defendants wished to prolong the illusion of double digit sales and earnings numbers and avoid an enormous stock price drop, particularly in light of the fact that Sunbeam stock comprises a huge portion of their income (a great deal of which were options exercisable at $36.85 per share) and that over $800 million of the Coleman acquisition was being made in Sunbeam stock. In fact, in a April 3, 1998 afternoon conference call Dunlap admitted that Sunbeam "did not adequately communicate the one-time charges and other issues."

52.    On April 3, 1998, when defendants announced their financial results for the first quarter of 1998, Sunbeam's stock price (which had closed at $45 9/16 per share on April 2, 1998), closed at $34 3/8. Its low for the day was $33 per share. This contrasted with the enormous gain that accompanied Sunbeam's March 2, 1998 announcement sending the stock from a $41 3/4 close on February 27, 1998 (the previous trading day) to a $45 5/8 per share March 2, 1998 close. The price continued to trade up as high as $52 7/16 in the days immediately following the announcement and settled in the $49 to $50 per share range until the Company's March 19, 1998 announcement which moved the price from a March 18, 1997 $50 1/16 close to a $45 3/8 March 19, 1998 close.

26

53.     Thus, defendants' statements during the Class Period were materially false and misleading because:  while issuing statements that double digit growth was going to and did occur throughout 1997, they failed to disclose that Third Quarter channel stuffing allowed Sunbeam to report its Third Quarter income and sales figures; that due to the channel stuffing efforts and lagging product sales, particularly in electric grills, this pattern of growth could not be sustained; that weakness in grill sales was already being experienced beginning in the Third Quarter and was expected to continue into at least the first quarter of 1998; that existing management was ill-equipped to address the challenges being faced by the Company; that Sunbeam rushed toward the acquisition of 3 companies, as announced, in order to mask declining sales and earnings figures and buoy Sunbeam's stock price without revealing the negative financial impact such acquisitions would have in the 1998 first quarter; and that the March 19, 1998 press release failed to indicate that contrary to defendants' statements, Sunbeam would experience a dramatic drop in its first quarter 1998 financial results.

54.     For the reasons set forth hereinabove, defendants representations detailed above were false and misleading and lacked a reasonable basis when made.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE
## SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

55.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

27

56.    Throughout the Class Period, defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Sunbeam stock.

57.    The purpose and effect of defendants' plan, scheme and course of conduct was to artificially inflate the price of Sunbeam stock and to artificially maintain the market price of Sunbeam securities.

58.    Defendants, who include the top officers of the Company, with the positions set forth hereinabove (and Dunlap and Kersh as directors), had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Sunbeam personnel to the SEC, securities analysts and members of the investing public, including plaintiff and the Class.

59.    As a result of the foregoing, the market price of Sunbeam securities was artificially inflated during the Class Period.  In ignorance of the falsity of the reports and statements and, in particular the material misstatement of Sunbeam's earnings during

28

the Class Period, and the deceptive and manipulative devices and contrivances employed by the defendants, plaintiff and the other members of the Class relied, to their damage, on the reports and statements described above and/or the integrity of the market price of Sunbeam stock during the Class Period in purchasing Sunbeam common stock at prices which were artificially inflated as a result of defendants' false and misleading statements.

60.    Had plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Sunbeam common stock at the artificially inflated prices that they did.

61.    Defendants' concealment of this material information served only to harm plaintiff and the other members of the Class who purchased Sunbeam common stock in ignorance of the financial risk to them as a result of such nondisclosures.

62.    As a result of the wrongful conduct alleged herein, plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63.    By reason of the foregoing, defendants have violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Sunbeam common stock during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(A)
### OF THE SECURITIES EXCHANGE ACT

64.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

65.     During the Class Period, each of the Individual Defendants, by virtue of his office or offices at, and/or directorship of Sunbeam and his specific acts, was a controlling person of Sunbeam within the meaning of Section 20(a) of the Securities Exchange Act.

66.     Each of the Individual Defendants' position made him privy to, and provided him with actual knowledge of, the material facts which Sunbeam concealed from plaintiff and the other members of the Class during the Class Period.

67.     Each of the Individual Defendants had the power and influence, and exercised the same, to cause Sunbeam to engage in the unlawful conduct and practices complained of herein by causing Sunbeam to disseminate the false and misleading information referred to above.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Securities Exchange Act.

69.     By virtue of the conduct alleged above, defendants are liable to the plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Sunbeam common stock during the Class

Period.

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor of plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.    Awarding plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

F.    Awarding plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

31

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:      April 22, 1998

Respectfully,

GOODKIND LABATON RUDOFF
& SUCHAROW LLP

By: _____

Peter H. Rachman
Fla. Bar No. 977756
Emily C. Komlossy
Fla. Bar No. 007714
2455 East Sunrise Blvd.
Suite 813
Fort Lauderdale, FL  33304
tel. (954) 630-1000
fax  (954) 565-1312

**OF COUNSEL:**

Jill S. Abrams, Esq.
ABBEY, GARDY & SQUITIERI, LLP
212 East 39th Street
New York, New York 10016
(212) 889-3700

Lawrence Klayman, Esq.
Fla. Bar No. 016240
Law Offices of Lawrence Klayman, P.A.
2255 Glades Road
Boca Raton, Florida  33431
(561) 997-9956

## SWORN CERTIFICATION

I, DENNIS BIRD, certify that:

1.    I have reviewed the complaint and authorized its filing.

2.    I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follow:

| Date of Purchase | Number of Shares | Price Per Share |
|---|---|---|
| 3/20/98 | 600 | 45 ½ |

5.    I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

1

The foregoing are, to the best of my knowledge and belief, true and correct

statements.

_Om Bund_  4/7/98.

**DENNIS BIRD**

(WPS1\SUNBEAM\BIRD.WPS\JS)

2

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

**CIV-MIDDLEBROOKS**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DENNIS BIRD, on behalf of himself and all others similarly situated.

**DEFENDANTS**

**98-8258**

SUNBEAM CORPORATION, ALBERT J. DUNLAP, RUSSELL A. KERSH and DONALD R. UZZI.

*MAGISTRATE JUDGE*
*GARBER*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT PALM BEACH
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

A-u PB - 8258 Middlebrooks/Garber

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

GOODKIND LABATON RUDOFF & SUCHAROW LLP
International Building, Suite 813
2455 East Sunrise Boulevard
Ft. Lauderdale, Florida  33304          (954) 630-1000

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | B ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | B ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | **PERSONAL PROPERTY** | B ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B ☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholder's Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent, Lease & Ejectment | ☐ 443 Housing/ Accommodations | B ☐ 530 General | ☐ 790 Other Labor Litigation | A ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A ☐ 535 Death Penalty | A ☐ 791 Empl. Ret. Inc. Security Act | A ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B ☐ 550 Civil Rights | | | |
| | | B ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

LENGTH OF TRIAL
via 14 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☒ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  4·22·98

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 513529  AMOUNT 150.00  APPLYING IFP ___  JUDGE ___  MAG. JUDGE ___

4-22-98